# Robert Dady v. James M. Condit.

|104    507|
|a209s 488|

1.  EVIDENCE—*Of Value of Land by Proof of Sales in Vicinity.*—No hard and fast rule can be laid down, determining just what degrees of similarity must exist in order to make proof of sales competent evidence of the value of land.  If there is a general similarity in location, character and adaptability to use, and the sales take place about the time the value is to be fixed, the proof is admissible, and it is for the jury to determine from all the facts surrounding such other property and sales, how far such sales tend to show the value of the property in controversy.

2.  SAME—*Reading of Notes by Witness Who Had Been the Official Court Reporter.*—It is competent for a witness who had been the official court reporter to read from his note book certain questions put to defendant as a witness in a former case and his answers thereto, where the former reporter states that defendant testified in that case, and he took down that testimony and had his stenographic notes thereof present; that he took the evidence accurately to the best of his ability; that he remembered that at the time he wrote his notes they were correct; but that he did not give the testimony as a matter of independent recollection.

3.  INSTRUCTIONS—*Harmless Error.*—A slight inaccuracy in an instruction can not avail a party where he himself has presented and obtained instructions containing the same inaccuracy, where the amount of the verdict shows that the jury had no occasion to consider the form in which to express a verdict for the amount of the tender only.

4.  SAME—*That Plaintiff Could Take Advantage of Increased Value Above Contract Price.*—An instruction which tells the jury that if conditions were such at the time when the deed to land purchased was to be delivered that the land could have been sold in open market for a higher price than the plaintiff agreed to pay for it, then such increased value above the contract price must be taken into consideration whether those conditions were permanent or temporary, states a correct principle of law.  The fact that after plaintiff could have sold it and collected or secured the price, the land depreciated in value and selling price, could not diminish plaintiff's recovery.  He is entitled to the benefits of the position he would have occupied if the deed had been made as agreed.

5.  INTEREST—*On Damages for Breach of Contract.*—Where the damages resulting to plaintiff by a breach of a contract are uncertain and indefinite, interest should not be allowed.

Assumpsit, upon a contract for the sale of land.  Appeal from the Circuit Court of Lake County; the Hon. CHARLES E. FULLER, Judge presiding.  Heard in this court at the April term, 1902.  Affirmed upon remittitur being filed.  Opinion filed October 14, 1902.

Eddy, Haley & Munroe, attorneys for appellant.

Hoyne, O'Connor & Hoyne, attorneys for appellee; John L. Griffith and Elam L. Clarke, of counsel.

Mr. Justice Dibell delivered the opinion of the court.

On January 14, 1891, Dady entered into a written contract to convey to Condit a certain quarter section of land near Waukegan, in Lake county, for $150 per acre, $500 to be paid as soon as an abstract was furnished showing good title, $3,000 to be paid on or before August 1, 1891, and the balance to be divided into four equal payments, payable on August 1st, in the years 1894, 1897, 1900 and 1903, respectively, with interest on the deferred payments at six per cent per annum, payable semi-annually. A deed was to be delivered August 1, 1891, and the last four payments were to be evidenced by notes and secured by mortgage on the premises. On January 17, 1891, three days after Dady made his contract, the Washburn & Moen Manufacturing Company purchased a large tract of land on the margin of Lake Michigan some distance east of Dady's quarter section, on which to erect a manufacturing plant. Dady conceived he had been overreached and defrauded by Condit, and that his contract had not been delivered, and he accordingly did not furnish any abstract, and refused to accept $500, when tendered, and on July 31, 1891, refused a tender of $3,500, and of notes for the residue of the purchase price and a mortgage securing them, and refused to execute a deed. On August 10, 1891, Condit brought suit against Dady for breach of contract. On April 23, 1892, Dady filed a bill to enjoin the prosecution of the suit at law and to cancel the contract. That suit was determined adversely to Dady in Condit v. Dady, 56 Ill. App. 545, and Dady v. Condit, 163 Ill. 511, and the bill of complaint was afterward dismissed pursuant to the mandate of this court. The original suit at law seems to have been abandoned. On November 22, 1897, this suit for damages for breach of contract was brought by Condit against Dady. A jury rendered a ver-

dict for plaintiff for $4,920 and the trial court gave plaintiff a new trial. A second jury awarded plaintiff $15,000 and plaintiff remitted $3,000 and had judgment for $12,000 which was affirmed by this court in Dady v. Condit, 87 Ill. App. 250, but was reversed by the Supreme Court in Dady v. Condit, 188 Ill. 234. A third jury awarded plaintiff $16,000, and judgment was rendered thereon, and this is an appeal by defendant from that judgment. Before the last trial defendant tendered and paid into court $1 and the costs, and pleaded said tender, and issues were joined thereon. The chancery proceeding determined the validity of the contract, and its breach is not denied, and the only question left is whether plaintiff is entitled to more than nominal damages, and if so, how much. If the land was worth more on August 1, 1891, than plaintiff agreed to pay for it, he is entitled to recover that excess in value. The litigated question of fact was, what was the land worth on August 1, 1891.

The court permitted plaintiff to prove sales in 1891 and 1892 of lands near by for $300 per acre, and of the Martin tract for $600 per acre. It is argued this testimony was incompetent because the sales were not of a similar property and were not for cash, because the vendees did not know the value of the property and because the sales failed. All these tracts were farm land. They were contiguous. They had the same general characteristics. Dady's land had no improvements except a fence and a few fruit trees. Most of the other tracts had other improvements of comparatively slight value, which improvements the testimony showed were not taken into consideration in making the purchase. The other lands were better for farming purposes than Dady's. The main difference, however, was that these other lands were nearer the points where factories were likely to be established, and where a village was likely to be laid out. While it will be seen further on that we regard the difference in value as material and important, yet we are of opinion that the other properties were so far similar to Dady's in their situation

that it was proper to admit proof of the sales of such properties at about the time Dady should have deeded to Condit, the differences being matters to be considered by the jury in determining how far such other sales aided in determining the value of the Dady property.  It is seldom possible to show sales of other property whose location, improvements and adaptability to particular uses are exactly the same as that to be valued.  Where the properties are wholly dissimilar, the proofs should not be admitted.  A sale of a business block in the city of Waukegan would not aid in fixing the value of Dady's farm land.  But no hard and fast rule can be laid down, determining just what degrees of similarity must exist in order to make proof of sales competent.  If there is a general similarity in location, character and adaptability to use, and the sales are about the time the value is to be fixed, the proof is admissible, and it is for the jury to determine from all the facts surrounding such other property and sales, how far such sales tend to show the value of the property in controversy. Provision Co. v. City of Chicago, 111 Ill. 651.  Sales of real estate are seldom for cash.  Dady's contract was on time.  We think proof of these sales was not inadmissible because they were on time.  The knowledge or ignorance of values possessed by the vendees was merely a fact going to the importance and weight the jury should give to the prices paid by them.  The sales did not fail.  The vendors sold their notes and mortgages at certain discounts. This weakened the effect the sales were calculated to have upon the jury, and tended to show the prices paid exceeded the value of the lands.  But it did not deprive the proof of all value nor render it inadmissible.  From the evidence of the discounts the jury could see how much the vendors really received, and that was the important fact.  We are of opinion the rulings of the court upon this testimony were correct.  It is also claimed the opinions of plaintiff's witnesses were based upon imaginary uses to which the property could be put, and therefore they were improper. These witnesses qualified themselves to give their opinions

Dady v. Condit.

as to the value of Dady's quarter section, and were properly permitted to give them. The cross-examination did not destroy their testimony or render it incompetent, but only tended to weaken the force to which it was entitled.

A witness who had been the official court reporter, read from his note book certain questions put to defendant as a witness in the chancery cause and his answers thereto. It is argued the witness should not have been permitted to read from his notes, but after refreshing his recollection from them, should have been required to testify entirely from his memory so refreshed. He stated that defendant testified in that case, and he took down that testimony and had his stenographic notes thereof present; that he took the evidence accurately to the best of his ability; that he remembered that at the time he wrote his notes they were correct; but that he did not give the testimony as a matter of independent recollection. We think this proof competent. Brown v. Luehrs, 79 Ill. 575; Luetgert v. Volker, 153 Ill. 385; Hereford v. People, 197 Ill. 222, 238; C. R. I. & P. R. R. Co. v. Harmon, 16 Ill. App. 31; S. C., 17 Ill. App. 640; C. & A. R. R. Co. v. Robinson, 16 Ill. App. 229.

An instruction offered by defendant was so modified by the court as to tell the jury that plaintiff was in any event entitled to recover nominal damages, whereas it is argued if they found for defendant on the plea of tender their verdict should have been for defendant. It is true that in such case their verdict should be, "We find for defendant under the plea of tender." Cilley v. Hawkins, 48 Ill. 308; Leonard v. Patton, 106 Ill. 99. But this slight inaccuracy can not avail defendant here, first, because defendant presented and obtained instructions numbered ten and fourteen containing the same inaccuracy; and second, because the amount of the verdict shows the jury had no occasion to consider the form in which to express a verdict for the amount of the tender only. Much criticism is made of instructions given for plaintiff, and of modifications of instructions offered by defendant, and it is claimed they are subject to the same objections pointed out by the

Supreme Court to the instructions given at the last preceding trial. Without discussing them in detail we are of opinion they are not inaccurate, and that if they are in any respect incomplete they are entirely remedied by the instructions given at the request of defendant, which fully cover the ground. The main objection is that these instructions were to the effect that if conditions existed on August 1, 1891, which affected the market value of real estate about Waukegan, and if in consequence thereof this land would then have sold in open market for a higher price than Condit agreed to pay for it, then such increased value above the contract price must be taken into consideration, whether those conditions were permanent or temporary. The application of this doctrine was that the proof showed that two or three years later, partly because of the panic of 1893, and partly because the Washburn & Moen Company did not erect as large a plant as the public expected and certain other expected enterprises did not come to that vicinity at all, real estate there depreciated in market value. We are of opinion these instructions announced a correct principle. If plaintiff could have resold this land on August 1, 1891, to responsible parties at an advanced price, and collected the price, then the excess of what he could then have sold for, over what he agreed to pay, constitutes the amount he lost by the failure of defendant to perform his contract, and plaintiff is entitled to recover that loss; and the fact that, after plaintiff could have sold it and collected or secured the price, the land depreciated in value and selling price, should not diminish plaintiff's recovery. He is entitled to the benefits of the position he would have occupied if the deed had been made as agreed. So far as these conditions were visionary and would not have increased the actual market price on that day, the instructions for plaintiff did not include them, and if the language of any such instruction was so vague as to possibly include them, they were excluded from consideration in such pointed terms by the instructions given for defendant that the jury, in our opinion, could not have been misled on that subject.

Dady v. Condit.

By defendant's motion for a new trial, and his assignment that the court erred in overruling it, we are required to decide whether the damages awarded are excessive. Dady's land is very uneven and rolling; the high land has a poor clay soil, and the low land has ravines, sloughs, and pond holes. It has stumps and underbrush and second growth timber. It has no improvements except a fence and a few apple trees. It is not adapted to tillage, or to any farm purpose except pasture, and it has never been put to any other use. Two witnesses for plaintiff testified that on August 1, 1891, the farm was worth $300 per acre; another $300 to $400; another $400; another $300 per acre for the part west of a highway which divides the farm, and $400 to $500 for the part east of that road. These witnesses gave these figures as the value of the land for purposes of subdivision and speculation. So far as they testified to its value of August 1, 1891, for farming purposes, the only use to which it was ever put, they generally fixed it at not over $60 per acre. Plaintiff also proved that defendant testified in the chancery case that he considered his land was worth $150 per acre on August 1, 1891, without the presence of the Washburn & Moen Factory. The Washburn & Moen lands and factory are directly south of the city of Waukegan, on the lake shore. The east side of Dady's land is a mile and a half from the lake, and three quarters of a mile west of the most western line of the Washburn & Moen lands. It is a mile and a half by square corners from the crossing of the C. & N. W. Ry. and the E. J. & E. Ry. to the nearest corner of Dady's land. Neither road comes nearer Dady's land than a mile. Plaintiff proved that the lands of Kristin, Schuneman, Strong, Ferguson and Hamilton, all of them nearer, either to the Washburn & Moen factory or said railroad crossing, than Dady's land, were sold in 1891 or 1892 for $300 per acre; that the lands of Martin, which come up to said railway crossing and lie along both said railways, were sold for $600 per acre; and that DeWolfe bought ten and one-third acres lying between Dady's land and Waukegan in March, 1891, for $300 per

acre, and sold it in December, 1892, for $400 per acre. Appellee claims the Murphy farm, north of Dady's, was sold for $300 per acre, but does not call our attention to any place in the record where such proof appears. There is hearsay proof of two other sales in the record. On the other hand defendant produced fifteen witnesses who fixed the value of Dady's land on August 1, 1891, at prices ranging from $45 to $125 per acre, most of them naming $50 to $60 as their judgment of its value. Some of these testified the land had no value for purposes of subdivision and speculation, but only as farm land; while others stated they had no knowledge on that subject. The effect of the sales above mentioned was weakened by the fact that most of the purchasers did not pay for the lands they purchased; but after they made the cash payments required (generally one-third), and gave notes and mortgages on the premises to secure the deferred payments, and paid considerable parts thereof, the vendors sold these securities, with substantial discounts, to a third party. Hamilton bought back the five acres where the house and most of the improvements stood, allowing $1,500 therefor, and afterward sold his unpaid notes and mortgage at a discount of about $4,000; Kristin discounted his $2,700; Ferguson submitted to a discount of $11,000; Schuneman sold his securities at a discount of $2,240; and Strong made a discount, but had no idea of its amount, as the business was transacted for him by an agent since deceased. The fact that none of the original purchasers availed themselves of these heavy discounts tends to show they were not able to pay for the property, even at the discounts. The fact that even after the cash payments and many of the deferred payments had been made, the holders of the remaining notes, so much improved in security by the payments made, were still willing to part with them at such discounts, shows that the land was at that time worth far less than they sold it for. No doubt the panic of 1893 and the collapse of the boom at Waukegan affected the value of these securities. Yet their depreciation in value was not merely the amount of the discount, but further the amount

of all payments theretofore made; and it is all to be considered in determining the weight which fairly ought to attach to the sales as proof of the value of Dady's tract. When it appears that a sale of land was to a party financially unable to pay and at a price far beyond what could be collected from the property, so that, after the value of a mortgage given to secure part of the purchase price has been fortified by the payment not only of a considerable sum in advance but also of a considerable part of the deferred payments, still the holders are willing to submit to heavy discounts to get rid of the securities, it is evident that the sale can not be treated as fairly proving that the market value of other similar property was equal to the contract price of the property so sold. It does not appear that any of these purchasers were financially able to pay the sums they agreed to pay. The contrary is the reasonable inference from the evidence.

It is, however, said by appellee that the price of $300 per acre, or $150 per acre more than plaintiff was to pay, would have warranted a verdict for plaintiff for $24,000; and that the jury have cut that $50 per acre, and allowed plaintiff only $100 per acre in excess of the contract price; and that this is sufficient to cover the effect of the discount on these securities given upon these other sales. That is in a measure true. The jury might perhaps have reasonably concluded that these other tracts were worth $250 per acre at the time they were sold. But we are of opinion there were other reasons why they were not warranted in concluding Dady's land was worth $250 per acre at that time. As farm land it was, less valuable than the other tracts. There were three things to give rise to prospects that these lands might have a value for purposes of subdivision into lots and sale for homes. One was, the proximity of the Washburn & Moen plant, which was being erected on August 1, 1891; another was the hope that other manufacturing plants would locate there; and the third was the prospect a village might arise at the crossing of the E. J. & E. Ry. and the C. & N. W. Ry. Dady's land

was farther from the Washburn & Moen plant than these other lands, and less easily accessible from the plant than the other lands. There was so much other farm land nearer to Washburn & Moen's plant, and more accessible therefrom, than Dady's, that it was evident it must be many years before there could be any reasonable expectation that homes for workmen at that plant would be erected on Dady's land. No doubt people engaged in speculation would give more for Dady's land at that time than its mere value as farm land, because of that remote chance, but the farther away and the more inaccessible the land the less its speculative value. The same suggestions apply to the hoped-for coming of other industries. If they came they were likely to locate on or near the large tract of land the Washburn & Moen Company bought, or along the railroads. There was no prospect they would come perceptibly nearer Dady's land. Martin's land came up to the junction of the two railroads, and lay along said railroads, and that was the obvious reason why it sold at so high a price. The village of North Chicago was afterward located there, and it has a small population; but that junction is a long distance from Dady's land, and the prospect that a village might arise there must have had very slight tendency to give a speculative value to Dady's land. We are of opinion the jury failed to give full consideration to the defects of Dady's land and to its remoteness from the factory referred to, and to the large amount of land more favorably situated, and entirely adequate to the wants of actual residents for many years to come. Plaintiff's witnesses dealt with large figures and in an airy way. When such a witness said Dady's land was worth $300 to $400 per acre, he was leaving $16,000 margin between his lowest and highest figures of value for a quarter section of very poor scrubby farm land. Such a wide margin indicates the absence of any solid basis for the estimate. Defendant's witnesses were much more conservative, in our judgment, and came much nearer stating tangible realities, though we do not doubt that the possibility that this land might at some future time be occupied by homes gave it some addi-

tional value which these witnesses failed to perceive. Plaintiff did not invest any money in these lands. He paid out nothing. The verdict awarding him $16,000 as damages for the breach of this contract seems to us excessive, when the proof is conservatively considered. We have concluded if plaintiff will remit one half the judgment we will affirm it for $8,000, and that otherwise the judgment ought not to stand.

Appellee has assigned as a cross-error the refusal of the court below to allow interest at five per cent per annum from August 1, 1891, to the date of the verdict upon the difference between the contract price and the market value on August 1, 1891. The statute relative to interest on money due by the terms of a written contract does not apply. The money here recovered is not due by the terms of the contract. Defendant did not by that contract agree to pay any money to plaintiff. Nor were the damages resulting to plaintiff by a breach of the contract so certain and definite that interest should be allowed thereon. Brownell Improvement Co. v. Critchfield, 197 Ill. 61, 71; Harvey v. Hamilton, 54 Ill. App. 507.

Appellee having, pursuant to the suggestions contained in the foregoing opinion, filed herein a remittitur of $8,000, said judgment is affirmed in the sum of $8,000. The appellant will be required to pay one-half the costs of this court, and the appellee the remaining one-half thereof.

Remittitur of $8,000 and judgment affirmed for $8,000.

Mr. Presiding Justice BROWN having at one time been of counsel in this case, took no part in its consideration here.